# In the United States Court of Federal Claims

No. 15-1233L

(Filed: February 28, 2020)

* * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| PAULINE MILLS, et al., | Fifth Amendment Taking; Rails-to-Trails; Motion for Partial Summary Judgment; RCFC 56; Trails Act; Florida Law; Right-of-Way |
| *Plaintiffs*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

* * * * * * * * * * * * * * * * * * * *

*John R. Sears,* St. Louis, MO, for plaintiffs.

*Barbara M.R. Marvin*, who was at the time with the United States Department of Justice, Environment & Natural Resources Division, Washington, DC, with whom was *Jean E. Williams*, Deputy Assistant Attorney General.

OPINION

BRUGGINK, *Judge*.

This is an action brought under the Tucker Act[1] for an alleged failure to pay just compensation owed under the Fifth Amendment. Plaintiffs are Florida landowners whose properties adjoin a railroad which has ended its operations. Plaintiffs allege that, but for the operation of the Trails Act,[2] the

---

[1] The Tucker Act provides that the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2012).

[2] The Trails Act "preserve[s] shrinking rail trackage by converting unused rights-of-way to recreational trails." *Preseault v. I.C.C.*, 494 U.S. 1, 4 (1990) (*"Preseault I"*).

railroad would be deemed to have abandoned the track and their underlying fee interests would no longer be burdened by an easement. Pending before the court is plaintiffs' August 26, 2019 motion for partial summary judgment on liability under Rule 56 of the Rules of the United States Court of Federal Claims. Defendant has cross-moved but limited its motion to partial summary judgment on threshold title issues.

The matter is fully briefed, and oral argument was held on January 15, 2020. The motions raise difficult questions of Florida real estate law, complicated by the virtually complete lack of original documents. For the reasons explained below, we grant plaintiffs' motion for partial summary judgment on liability.

## BACKGROUND[3]

This rails-to-trails case arises out of actions taken by the Surface Transportation Board ("STB"), an agency of the United States, that issued a Notice of Interim Trail Use ("NITU") on July 14, 2014, to CSX Transportation, Inc. ("CSXT"). Prior to issuing the NITU, CSXT filed a Verified Notice of Exemption for the purposes of abandoning approximately 11.62 miles of rail line on CSXT's Southern Region, in Alachua County, Florida. CSXT is the successor in interest to the Live Oak, Tampa and Charlotte Railway ("LOTCHR"), which received transfers of interests in land from plaintiffs' predecessors in interest in the 1880's. The nature of those interests is at issue in the pending motions.

Plaintiffs are the Estate of Pauline Mills (Claim 1), Southeast Investment Management, Inc. ("SIM") (Claims 2 and 3), Mary Forrester (Claim 4), Bowtie Properties, Inc. (Claim 5), Florida Timber Co. (Claim 6), the Eric J. Parker Living Trust (Claim 7), and the Estate of Bettye R. Freeney (Claim 8). Each plaintiff claims to have owned fee simple title to the land adjacent to and underneath the railroad line on the date of the taking. Plaintiffs argue that, "[b]ut for the operation of the Trails Act, [they] would have the exclusive right to physical ownership, possession, and use of their property free of any easement for recreational trail use or future railroad use." Am. Compl. ¶ 13.

---

[3] The facts are not materially disputed and derive from the Plaintiffs' Amended Complaint ("Am. Compl.") (ECF No. 15), Pls.' Findings of Fact ("Pls.' Facts") (ECF No. 70) and accompanying exhibits, as well as the parties Joint Stipulations Regarding Title Matters ("Joint Stipulations") (ECF No. 37).

Defendant's response relies on the interests of railroads which have operated in this location for over one hundred years. The railroad interests trace back to July 23, 1881, when LOTCHR was incorporated under the general laws of Florida. As early as 1883, LOTCHR began to acquire land and obtain deeds for construction of a railroad corridor, although none of the deeds that LOTCHR obtained at that time are in the chain of title relevant in this case. In 1884, however, LOTCHR merged with the Savannah, Florida, and Western Railway Company, and, in 1893, LOTCHR connected with the South Florida Railroad Company ("SFR"), which had already begun constructing a railroad corridor in the area. Relying on the railroad charter that SFR had obtained from the state of Florida, LOTCHR obtained interests in land that are at issue in this case.

The sources of the railroad interests at issue here can be classified into three groups. The easiest to dispose of relates to Claims 2 and 3. The parties agree that, on May 5, 1893, a deed from J. Cummer & Son Lumber Co. conveyed an easement limited to railroad purposes to LOTCHR and that plaintiff SIM is thus entitled to a finding of summary judgment on the threshold title issue in its favor. *See* Joint Stipulations ¶ 2.

The second type of conveyance implicates the claims of the Florida Timber Co. (Claim 6) and the Eric J. Parker Living Trust (Claim 7). This conveyance was a "bond for deed" executed on January 17, 1893, by the Anglo Florida Phosphate Company. The "bond for deed" provides that:

> [the Anglo Florida Phosphate Company] of the county of [Alachua] and State of [Florida] for and in consideration of the sum of [One] Dollar[], do hereby bind myself, my heirs, executors, administrators and assigns, firmly by these presents, to make good and sufficient deeds of warrantee to [SFR] of the State of Florida, to a right of way [100] feet wide through the following lands . . .
>
> Reserving to myself and assigns the right to mine and remove all phosphate and mineral deposits in such manner as not to interfere with or endanger the track or road-bed of said railroad company when constructed. The conditions of the above bond being that said [SFR] shall within [six] months build a railroad through said property; otherwise of no force and effect . . .
>
> On this day personally appeared before me . . . to me well known, and acknowledged that [they] executed the foregoing bond for deed, for the purpose therein expressed.

3

Pls.' Facts, Ex. H.

The parties disagree as to whether the instrument from the Anglo Florida Phosphate Company was a present conveyance of any interest in land, and, if it was, whether it was a fee or only an easement for a right-of-way for railroad purposes. Plaintiffs argue that the "bond for deed" operated as a present conveyance, but only of an easement. Defendant argues that the instrument was not a present conveyance of any kind and ineffective to transfer any interest in land.

The third category of claims relates to the four properties represented in Claims 1, 4, 5, and 8. As to these parcels, the parties have not been able to locate any instrument of transfer. Instead, plaintiffs offer secondary evidence: a valuation map prepared by the Interstate Commerce Commission ("ICC"), STB's predecessor agency, which indicates that the railroad interests in these properties were obtained under authority of state charter granted to the railroad. The ICC valuation map was prepared in 1917 based on information furnished to the ICC by railroad companies in order to inventory their property. The then-functioning railroad, the Atlantic Coast Line Railroad Company ("ACL"), represented that there was "No Record of Conveyance" with respect to these four properties and that the railroad had obtained its "[p]ossession under Charter." Pls.' Facts, Ex. F at PLF000027.[4] The parties have been unable to locate the relevant charter. They disagree about the legal effects of this state of the record. Defendant urges that, in the absence of direct proof by plaintiffs that only an easement was obtained, the court should assume that the railroad obtained a fee. Plaintiffs, of course, urge the contrary.

Plaintiffs also argue, in the alternative, that even if this court finds that the railroad did not acquire the lands related to this third category of claims by Charter, it should consider whether the railroad obtained the land by prescriptive use. Defendant, also in the alternative, responds that, if the railroad did not obtain the land pursuant to its charter or a conveyance, it could only have an interest by adverse possession, but that it is plaintiffs'

---

[4] The ICC valuation also provides a column labeled "Kind of Instrument" which shows that the J. Cummer & Son Lumber Co. obtained its interest in property relating to Claims 2 and 3 by deed. *Id.* With respect to the interest in property relating to Claims 6 and 7, the ICC valuation map uses the terms "bond" and "deed" interchangeably for the "Kind of Instrument" granted by the Anglo Florida Phosphate Company. *Id.*

4

duty to prove the elements and that what was acquired was only an easement, two things defendant asserts they have failed to do.

Even assuming that the railroads only operated under easements with respect to these four parcels, defendant also argues that "the uses authorized by the Trails Act are not inconsistent with the scope of any such easements." Def.'s Cross-Motion for Partial Summ. J. ("Def.'s Cross-Motion") 6. Defendant further requests that this court withhold any ruling on the United States' liability until the Federal Circuit issues a ruling in the pending appeal in *Caquelin vs. United States*, 140 Fed. Cl. 564 (2018), *appeal docketed*, No. 19-1385 (Fed. Cir. Jan. 9, 2019).

It is undisputed that CSXT quit operating on the trail in question in July of 2014, and that the parcels owned by plaintiffs adjoin the railroad corridor. *See* Joint Stipulations ¶ 3. The NITU was issued on July 14, 2014, and published in the Federal Register on July 15, 2014. Since that time, no trail use agreement has been reached between the STB and CSXT, and the current negotiation deadline for expiration of the NITU has been extended until February 16, 2020.[5]

## DISCUSSION

The Trails Act "preserve[s] shrinking rail trackage by converting unused rights-of-way to recreational trails," known as "railbanking[.]" *Preseault I*, 494 U.S. at 5. In order for a railroad right-of-way to be converted into a recreational trail, the railroad must either (1) file a standard abandonment application with the STB or (2) seek an exemption from filing the application. *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). "If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Id.* at 1228-29 (citations omitted).

If the railroad and trail operator are willing to negotiate a trail use agreement, the STB stays the abandonment and issues a NITU, allowing the railroad right-of-way to be "railbanked[.]" *Id.* at 1229. The government's action to issue a NITU "operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Id.* at 1233-34. Thus, "the appropriate triggering event for any takings

---

[5] Counsel has notified the court that a trail use agreement still has not been entered, nor has the deadline been extended.

5

claim under the Trails Act occurs when the NITU is issued." *Id.* at 1235.

The operation of the Trails Act, like any government action, is subject to the Fifth Amendment Takings Clause. *Preseault I*, 494 U.S. at 12-16. If the government takes private property pursuant to the Trails Act, it must provide just compensation. *See id.* If the railroad owns the underlying right-of-way in fee simple at the time of the alleged taking, however, "another party cannot be owed just compensation for the taking of that land." *Whispell Foreign Cars, Inc. v. U.S.*, 97 Fed. Cl. 324 (2011). In a takings case, "only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. U.S.* 271 F.3d 1090, 1096 (Fed. Cir. 2001). "A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." *Caldwell*, 391 F.3d at 1229 (citations omitted).

Thus, as the Federal Circuit explained, a rails-to-trails takings claim presents three questions for determination:

> (1) who owned the strips of land involved, specifically did the [r]ailroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the [r]ailroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the [r]ailroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("*Preseault II*"). The parties have stipulated that the plaintiffs owned the adjacent parcels of land to the railroad corridor on July 14, 2014. The issue raised by both parties' motions is whether the railroad owned the land underlying the right-of-way in fee simple or whether it only had an easement.

We analyze the property rights of the parties under the applicable state law, in this case, that of Florida. *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015) ("Rogers I") (citing *Preseault II*, 100 F.3d at 1543). Florida, like many other states, follows the well-established rule:

> [w]hen the language of a deed is clear and certain in meaning and the grantor's intention is reflected by the language employed, there is no room for judicial construction of the

6

> language nor interpretation of the words used . . . If there is no ambiguity in the language employed then the intention of the grantor must be ascertained from that language.

*Rogers v. United States*, 184 So.3d 1087, 1095 (Fla. 2015) ("Rogers II"). A court should "consider the language of the entire instrument in order to discover the intent of the grantor, both as to the character of the estate and the property attempted to be conveyed, and to so construe the instrument as, if possible, to effectuate such intent." *Reid v. Barry*, 93 Fla. 849, 852 (1927). Here, of course, the typical admonition is of little use, given the paucity of transfer instruments. We turn now to the estates at issue.

   A.  The Anglo Florida Phosphate Co. Instrument

The Anglo Florida Phosphate Co. instrument purports to be a "bond for deed," which we quote above. It is the only instrument that the parties were able to locate with respect to the claims of the Florida Timber Co. (Claim 6) and the Eric J. Parker Living Trust (Claim 7).

The parties have different views of the effect of the "bond for deed." Plaintiffs contend that the words of the instrument constitute an immediate transfer of an easement: "the bond serves as a deed, the purpose of the bond was a conveyance, and the conveyance was a right in land and not of land itself." Pls.' Resp. to Def.'s Cross-Mot. For Partial Summ. J. ("Pls.' Resp.") 3. Plaintiffs argue that, because the instrument granted only a right-of-way, expressly retained mineral rights, and contained a clause requiring the railroad to be built within six months, that it conveyed an easement at most.

Defendant, on the other hand, argues that the bond for deed was ineffective to pass title, pointing out that it does not contain any granting language and has no habendum clause. Specifically, defendant argues that unlike the language contained in the J. Cummer & Son Lumber Co. deed, which states that the lumber company "has granted, bargained, sold and transferred, and . . . does grant, bargain, sell, and transfer unto the [Railroad], its successors, and assigns the right of way for Railroad purposes over a strip of land[,]" the bond for deed contains no language granting a present estate. Def.'s Reply in Supp. of Cross-Motion for Partial Summ. J. ("Def.'s Reply") 2. Defendant argues that "the language in the document is that of a contract pursuant to which the grantor is agreeing to enter into a deed in the future giving the railroad title to, or rights in, its property." Def.'s Cross-Motion 10.

Defendant also argues that, if construed to convey anything, the instrument contemplated a grant of a fee, not an easement, because,

7

according to the government, in Florida, a grant of a railroad right-of-way is presumed to be a fee. Moreover, defendant argues that the clause requiring the railroad to be built does not provide for a reverter of the property interest, and that the reservation of mineral rights is inconsistent with the grant of only an easement.

In *Tucker v. Cole*, 148 Fla. 214, 215 (1941), the Florida Supreme Court considered whether a similar instrument was sufficient to convey a present estate. The written instrument in that case provided:

> 'Know all Men By These Presents that I, B. M. Dell of the State of Florida and County of Alachua have this day bargained and sold, aliened, confirmed and delivered unto R. J. Steele & J. W. Roper of the State of North Carolina & Co. of Richmond a certain tract or parcel of land situate, lying and being in the State of Florida and County of Marion on the South side of Orange Lake in Township Twelve (12) South of Range 22 East and North of Section 26 containing six hundred & forty acres (640), also two other parcels of land adjoining this containing 120 acres. The said Steele and Roper agreeing to pay me for the above named lands the sum of Six Thousand Dollars in three several installments as follows, viz. Two Thousand Dollars on the 20th February next, Two Thousand Dollars on the first of January 1856, Two Thousand Dollars on the first of January 1857 and I agree and bind myself, my heirs, executors administrators and assigns in the sum of Twelve Thousand Dollars to the said Steele & Roper to make them a title or deed to the above named land in fee simple when they have made me the third or last payment as above prescribed. In witness of which I have hereunto set my hand and Seal this the 18th day of December 1854.[']

*Id.* at 215-16.

The Florida Supreme Court agreed with the trial court's determination that the parties' intention was sufficiently clear from the instrument to convey a present estate. The key to this holding was the presence of a granting clause: "have this day bargained and sold, aliened, confirmed and delivered." *Id.* at 219. In so holding, the court cited with approval to 16 American Jurisprudence section 20, which the court stated provided:

> 'In order that an instrument purporting to convey title to land or an interest or estate in land may be valid as a deed and

8

> operative to pass such title to or interest in land, it is essential that there be a grantor, a grantee and a thing granted, and that it convey a present interest or estate. It is further necessary that the instrument be signed by the grantor, someone whom he directs to sign for him, or his authorized agent, be attested and acknowledged in conformity to the local statutory requirements, and delivered by the grantor to the grantee, or to someone in his behalf and accepted by the grantee. No prescribed form is, however, essential to the validity of a deed or to make it operative if it makes known the transaction. To make a conveyance valid, it is in general sufficient that there be parties able to contract and to be contracted with, a proper subject matter sufficiently described, apt words of conveyance, and an instrument of conveyance duly sealed and delivered. Generally speaking, any words which denote the intention of the parties to a deed to transfer the title from one to another are sufficient to make a conveyance, and the court will give effect to that intention notwithstanding inaccuracy of expression or the inaptness of words used.'

*Id.* at 219-20.[6]

Here, although we have a grantor, the Anglo Florida Phosphate Co., a grantee, the SFR, and a thing to be granted, a right-of-way through the described lands, what is missing is conveyance of "a present interest or estate." There is no granting clause. We thus agree with defendant and find that the bond for deed was merely a contract whereby the grantor agreed to bind itself to provide a deed to the railroad at a later date. It was ineffective to transfer any interest in land to the railroad. The claim is not at an end, however. As we explain in detail later, we find that the railroad took this section by operation of its state charter, and, absent a record of a condemnation or conveyance, the railroad gained only an easement for railroad purposes. This result, we believe, is proper whether the SFR acquired its interest in the property via the Anglo Florida Phosphate Co. instrument or via operation of law by means of the railroad's charter because all that was conveyed or otherwise took was a railroad right-of-way.

Admittedly, the law in Florida on this subject is less than consistent. Defendant is able to point to *Florida Power Corp. v. McNeely*, where the

---

[6] We are unable to locate a first edition of American Jurisprudence. The relevant current second edition section is found at 23 Am. Jur. 2d Deeds § 12 (February 2020 update).

9

court held that "a railroad right of way . . . is not a mere easement or user for railroad purposes but is a fee vested in the railroad." 125 So. 2d 311, 316 (Fla. Dist. Ct. App. 1960) (*reh'g denied*, 138 So. 2d 341 (Fla. 1961)). *McNeely* in turn relies on *Atl. Coast Line R. Co. v. Duval Country*, 114 Fla. 254, 332 (Fla. 1934)), where the Florida Supreme Court held that:

> [a] railroad right of way in . . . [Florida] is not a mere easement or use for railroad purposes. Like other property it is acquired by purchase or condemnation and vests a fee in the company acquiring it which cannot be divested except as the law provides.

Id. at 332.

As Judge Williams of this court pointed out in *Rogers v. United States*, however, the parties in *Atl. Coast Line R. Co.* agreed that the railroad acquired a fee in the right-of-way, "[t]hus, when the Florida Supreme Court stated that a railroad right-of-way was not an easement, it did so in a context where there was no question that the railway had obtained the land in fee simple." *Rogers v. United States*, 90 Fed. Cl. 418, 430 (2009) ("Rogers III"). The relevant question was not before the court. I.e., the holding is merely dicta, at best. Indeed, the court in *McNeely* clarified that "[t]his is not to say that a railroad by arrangement or otherwise could not under any circumstances operate by virtue of an easement." *Id.* at 317.

Moreover, in *Rogers I*, 814 F.3d at 1299, the Federal Circuit clarified, by referral of a legal question to the Florida Supreme Court, that, under Florida state law, "a railroad can acquire either an easement or fee simple title to a railroad right-of-way and that no statute, state policy, or factual considerations prevails over the language of the deeds when the language is clear." *Id.* at 1309. It is incorrect, in other words, to assume that a grant to a railroad of a right-of-way in Florida is necessarily a fee.

We think the better view is that a "right-of-way" for railroad purposes should be construed according to its natural meaning, i.e. "[t]he right to pass through property owned by another." Right-of-Way, Black's Law Dictionary (11th ed. 2019). In addition, there was no reference in the bond to a fee estate or anything that might look like a fee estate, "land," for instance. If plaintiff was correct, in other words, that a present property interest was granted by the Anglo Florida Phosphate Co. instrument, it would have been an easement—the same result reached by our analysis below concerning the effect of the Florida railroad charter statute.

10

B. Properties Acquired by Railroad Charter

With respect to Claims 1, 4, 5, and 8, the parties agree that the ICC valuation map indicates that the railroad acquired its interests by charter.[7] Defendant argues, however, that simply because the ICC's notation indicated that the railroad acquired its property interest by charter, "does not equate to the railroad holding only an easement in the property." Def.'s Reply 4. Rather, defendant points out that, "under the Florida statutes applicable at the time the [r]ailroad acquired its Interests, chartered railroads could acquire and hold fee simple title in property." *Id.* (citing Chap. 1987 of the Act of February 19, 1874, ("Corporations–Railroads and Canals,") § 10 (the third power granted by the statute to railroad corporations in section 10), hereinafter referred to as "1874 Act, Chap. 1987."

Defendant, relying on the 1874 Act, Chap. 1987, points out that, at the time, railroad companies were authorized to "purchase, hold, and use such real estate and other property as may be necessary for the construction and maintenance of its road or canal . . . ." *Id.* § 10. The statute also provided that, when a "railroad or canal company formed under this chapter shall not have acquired any real estate required for the purposes of its incorporation," it shall have the right to acquire the land by condemnation. *Id.* § 13. As discussed below, however, neither party has produced any evidence that the railroad purchased the land in dispute, nor has either produced evidence of a condemnation proceeding.

In any event, while we agree with defendant that, under Florida statutes applicable at the time, a railroad *could* acquire and hold fee simple title in property by either purchase or condemnation, they were not limited to acquiring only fee estates. The deed from J. Cummer & Son Lumber Co., for example, is an instance of a Florida railroad obtaining an easement by purchase.

Defendant also argues that the ICC notation "held by Charter" cannot be construed as an "admission" regarding the means by which the railroad acquired its interests or to the nature of the interest conveyed. *Id.* In support of this argument, defendant cites to *Amaliksen v. United States*, 55 Fed. Cl. 167 (2003), wherein this court stated: "The purpose of [the ICC's] maps was to identify parcels for valuation, not to distinguish types of ownership." *Id.* at 175. Defendant concludes that the ICC notation does not show what

---

[7] The plaintiffs and corresponding claims are the Estate of Pauline Mills (Claim 1), Mary Forrester (Claim 4), Bowtie Properties, Inc. (Claim 5), and the Estate of Bettye R Freeney (Claim 8).

interest the railroad acquired or that the railroad began operations on the land without a deed; rather, it merely shows "that the [r]ailroad had the right to acquire and hold land pursuant to its charter from the State of Florida." Def.'s Reply 5-6.

Defendant's reliance on *Amaliksen* is misplaced. The issue there was whether it was appropriate to invoke any interpretive aids, such as earlier deeds or ICC valuation maps, to show ownership when the language of the deed was otherwise clear on its face. 55 Fed. Cl. at 172. Here, unlike *Amaliksen*, neither party has provided any evidence of a deed. On the contrary, plaintiffs have provided the only evidence of how the railroad acquired its property interests: the ICC valuation map, which explicitly states: "No Record of Conveyance" and "[p]ossession under Charter." Pls.' Facts, Ex. F.

While defendant agrees that "[the ICC valuation map] provide[s] a guide to identifying the conveyance instruments by which railroads acquired their interests in their railroad corridors," it argues that simply because the ICC valuation map provides that there is no record of conveyance and that the railroad obtained its interest in the property by Charter, this does not mean that the property was acquired without a deed. Def.'s Cross-Motion 14. Rather, defendant states that "this could simply mean that at the time the schedule was created[,] neither the ICC nor the [r]ailroad could identify or locate the deed or other conveyance instrument applicable to that property." *Id.* Defendant also suggests that plaintiffs have failed to search beyond the ICC valuation map for a record of a conveyance and relied on a mere presumption that no deed exists.

Plaintiffs counsel certified to the court, however, that the railroad "was subpoenaed in this case and produced all of its deeds and records of acquisition and [that] none of them are for these segments . . . ." Pls.' Resp. 6. Plaintiffs have done what they can, and it is thus inappropriate to speculate, as defendant does, that the railroads *might* have obtained their interests by fee and that we should merely assume that was the case.

Plaintiffs argue that, because the ICC valuation map clearly states that the property has "No Record of Conveyance" and because it identifies that the railroad obtained its "possession by Charter," this means that there was no conveyance instrument and that the only lawful means the railroad had for obtaining possession was by Charter. *Id.* Plaintiffs point out that the ICC valuation maps were created by the railroad, rather than the ICC, and each map identifies the railroad engineer who filed the map with the ICC. *See* Pls.' Facts, Ex. F. We reject defendant's speculation and agree with the plaintiffs

12

that these definitive statements, absent any evidence to the contrary, suffice to establish that there were no records of conveyance relating to these segments in the property at issue.

Plaintiffs conclude by arguing that, given that there are no records of conveyance and because the railroad acquired the property under color of charter, the only conclusion left is "that the railroad entered the property without a deed and used its powers to cut its easements through the property and begin operations." Pls.' Resp. 5. In support, plaintiffs cite *Pensacola & Atlantic R.R. Co. v. Jackson*, 21 Fla. 146, 152 (Fla. 1884), and *Florida Southern R. Co. v. Hill*, 23 So. 566, 570 (Fla. 1898). In *Pensacola & Atlantic R.R. Co.*, the Florida Supreme Court stated that when "a chartered railroad company wrongfully or without lawful right enters upon and takes possession" of land, the landowner is not divested of his title to the land. 21 Fla. at 146. Moreover, in *Florida Southern R. Co.*, the Florida Supreme Court opined that, when a railroad takes possession of land without the landowners' consent, and without condemnation proceedings, the railroad receives the same rights and interests "which they would have secured by regular condemnation proceedings, i.e. the right to the perpetual use of the property for the purposes of their incorporation . . . ." 23 So. at 570. Thus, plaintiffs argue that because the railroad obtained its interests in plaintiffs' properties under charter and without a conveyance or through condemnation, it obtained only easements for railroad purposes.

Defendant responds that *Florida Southern R. Co.* does not support plaintiffs' argument because there "the landowners claimed that the railroad 'unlawfully and wrongfully entered upon [their] land' and constructed its rights of way and tracks, and that they were entitled to compensation for the railroad's taking of their land." Def.'s Cross-Motion 16 (quoting *Florida S. R. Co.*, 23 So. at 567). Defendant urges that the court did not hold "that if a railroad takes land without a conveyance or other form of permission and without pursuing condemnation proceedings, it necessarily obtains only an easement for railroad purposes." *Id.* at 17. Rather, defendant argues that the court held that, under these circumstances, "the owner may treat his claim for compensation as a vendor's lien and foreclose in equity." *Id.*

While the court in *Florida S. R. Co.* assumed that the railroad had unlawfully and wrongfully entered onto complainant's land, "the complainants waived the tortious acts, ratified the [railroad's] possession, and regarded the taking and possession as done under the power of eminent domain." 23 So. at 570. Plaintiff's preferred remedy of ousting the railroad, in other words, was unavailable. Thus, the Florida Supreme Court did not rely on whether there was a tortious or wrongful taking, rather it considered

13

the appropriate remedies left to the complainants when the railroad took land without an agreement and without condemnation. *Id.* at 568.

Indeed the decision in *Florida Southern R. Co.* makes plain that although the Florida courts view possession under charter as "without permission" of the landowner when there was no purchase or condemnation, it is not truly tortious in the sense that there was no color of right. 23 So. at 570 ("even where the original taking is tortious, because against the consent of the owner, and without condemnation, it is, nevertheless, necessarily referable to the power of eminent domain"). In other words, the railroad charter gave it the right to enter; compensation would be determined later.

In making its determination that the railroad had to compensate the complainants for the property taken, the court analyzed the principles provided in *Organ v. Memphis & L.R.R. Co.*, 51 Ark. 235, 236 (1889), where the Arkansas Supreme Court held that, when a railroad takes land without an agreement and without condemnation, the owner of such land may deem the act as done under the right of eminent domain and demand just compensation. *Florida S. R. Co.*, 23 So. at 570. The Florida Supreme Court viewed the Arkansas Supreme Court's decision in *Organ* "as being eminently just, and correct in principle, for the transaction is nothing more nor less than an implied sale of an easement in the land, induced . . . by the compulsory features of the power of eminent domain . . . ." *Id.* (citations omitted). The Florida Supreme Court determined that "[t]he compensation due [to] the owner is always in part, and frequently wholly, purchase money for a perpetual interest in, or easement over, the land; and, inasmuch as equity always implies a lien for the purchase price upon a voluntary sale upon credit by the owner . . . ." *Id.* It went on to state that the railroad had "received the same rights and interests in complainants' property which they would have secured by regular condemnation proceedings, i.e. the right to the perpetual use of the property for the purposes of their incorporation . . . ." *Id.*

Although not explicitly discussed in *Florida Southern R. Co.*, it must be recognized that railroads in Florida were granted by the 1874 Act the right to enter lands for purpose of building railroads without permission from the owners, a form of eminent domain. 1874 Act, Chap. 1987 § 10 (fourth power granted). They were not forced to wait for conveyance or condemnation. If no voluntary conveyance was agreed upon, railroads were authorized to obtain title by condemnation. *Id.* §§ 13-14. Construction of the railroad was authorized before or pending the condemnation proceedings. *Id.* § 14. Discussion of "lawfulness" thus must be viewed in the context of this general grant of authority.

14

We thus conclude that the best distillation of the law in Florida is that, when a railroad company takes land under color of its statutory charter but without an agreement and without a condemnation proceeding, it does not divest the landowners of title and that the railroad merely obtains perpetual use of the land for the purposes of its incorporation, i.e. an easement for railroad purposes. We thus need not reach the issue of whether plaintiffs have met established the elements of adverse possession or right of use by prescription. There is no question what interest passed to the railroad with respect to Claims 1, 4, 5, 6, 7, and 8. We find that the railroad acquired only an easement in the land for railroad purposes by operation of charter.[8]

C. The Scope of the Easements

All that remains is defendant's fallback position that the scope of the easements might have encompassed railbanking. With respect to the properties conveyed by the J. Cummer and Son Lumber Co. deed, defendant does not dispute the scope of the easements. It agrees that the deed conveyed an easement expressly limited to use for railroad purposes. Therefore, the landowners that owned the property abutting the railroad right-of-way on the date that the STB issued a NITU are entitled to just compensation under the Fifth Amendment, as discussed below. As to the rest of the claims, however, defendant argues that the scope of those easements do not preclude railbanking and trail use.

Plaintiffs point out that this court "remains consistent in holding that railbanking with interim recreational trail use is not a railroad purpose and thus exceeds the scope of a railroad purpose easement." Pls.' Resp. 5. Specifically, plaintiffs point to *Glosemeyer v. United States*, 45 Fed. Cl. 771, 779 (2000), wherein this court rejected the government's argument that recreational trail use and railbanking qualified as railroad purposes. In *Glosemeyer*, this court quoted the Missouri Court of Appeals in rejecting the government's argument:

> The term 'railroad purposes' . . . does not encompass other forms of transportation, such as walking or bicycling, and the

---

[8] With respect to Claims 6 and 7, which we found not to have been voluntarily conveyed by the proffered bond for deed, we find the landowners in the same position as those in *Florida Southern R. Co.* The railroad entered the property and built a railroad, which, as we explained above, it had the color of right to do pending its acquisition of title by agreement or condemnation. That final step being missing from the record, the railroad acquired a perpetual right of use, which is to say an easement for railroad purposes.

> recreational purposes . . . . The proposed development of a hiking, biking, cross-country skiing, and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations.

*Id.* at 779 (quoting *Boyles v. Miss. Friends of Wabash Trace Nature Trail, Inc.*, 981 S.W. 2d 644, 649-50 (Mo. Ct. App. 1998)). Plaintiffs further cite a variety of decisions reaching the same result for other jurisdictions: *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009) (Colorado); *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005) (Idaho); *Preseault II*, 100 F.3d at 1533 (Vermont); *Schmitt v. United States*, 2003 WL 21057368 at *7, *8 (S.D. Ind. 2003); (Indiana); *Schneider v. United States,* No. 8:99CV315, 2003 WL 25711838 (D. Neb. Aug. 29, 2003) (Nebraska); *Blendu v. United States*, 75 Fed. Cl. 543 (2007) (Idaho); *Schnabel v. County of DuPage*, 428 N.E.2d 671 (Ill. 1981) (Illinois); *Pollnow v. State Dep't of Natural Resources*, 276 N.W.2d 738 (1979) (Wisconsin).

Furthermore, plaintiffs cite to this court's holding in *Rogers III,* where we held that, "[i]n Florida, the scope of an easement does not increase with time, and accordingly, the 'burden of a right of way upon the servient estate must not be increased to any greater extent than reasonably necessary and contemplated at the time of initial acquisition.'" *Id.* (quoting *Crutchfield v. F.A. Sebring Realty Co.*, 69 So. 2d 328, 330 (Fla. 1954)). In reaching the decision that railbanking and trail use did not fall into the scope of the easement granted to the railroad, this court relied on the Federal Circuit's analysis in *Preseault II*–i.e., whether at the time of the conveyance the parties contemplated that the railroad could preserve its future use of the right of way as a public trail.[9] *Id.*

---

[9] In *Preseault II*, the Federal Circuit determined that the language of the easement conveyed by the original parties did not contemplate the railroad's ability to preserve the use of the right-of-way for future public recreational trail purposes. The *Preseault II* court held:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not. Although a public recreational trail could be described as

16

Here, pursuant to its state charter, the railroad acquired an easement for railroad purposes. We find, as we have many times before, that the conversion of the easement to a public recreational trail constitutes a new and unauthorized use. The landowners who owned the property abutting the railroad right-of-way on the date the STB issued the NITU are entitled to just compensation under the Fifth Amendment, as discussed below.

D. The Date of the Taking

Defendant also requested that this court withhold any ruling on liability until the Federal Circuit issues a ruling in the pending appeal in *Caquelin*. As the Federal Circuit has not yet issued an opinion in *Caquelin*, defendant argues that this court should limit any ruling to a liability determination only if "a trail agreement become[s] finalized." Def.'s Cross-Mot. 7. Plaintiffs, however, argue that "[t]he Federal Circuit has not issued any ruling on any issue related to whether a taking occurs absent a trail agreement." Pls.' Resp. 15 (citing *Caquelin v. United States*, 697 Fed. App. 1016, 1019-20 (Fed. Cir. 2017)). Rather, plaintiffs argue that, according to the Federal Circuit's *per curiam* opinion in *Caquelin*, the court stated that "[e]n banc review may be warranted" based on the factors in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), to address "whether *Ladd* [*v. United* States, 630 F.3d 1015 (Fed. Cir. 2010)] should remain governing precedent." *Caquelin*, 697 Fed. App. at 1019.

On remand, Judge Lettow, in *Caquelin*, observed that the government may take property physically or by regulation. *Caquelin vs. United States*, 140 Fed. Cl. 564, 573 (2018). These takings may be further divided into two categories, categorical and non-categorical. *Id.* A categorical taking deprives

---

a roadway for the transportation of persons, the nature of the usage is clearly different. In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation. In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles. It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

100 F.3d at 1542-43.

landowners of all economically viable use of their property, while a non-categorical taking deprives the landowner of some amount of the economic use of their land. *Id.* Either taking may be permanent or temporary. *Id.* Ultimately, Judge Lettow determined that, in a rails-to-trails case, a categorical physical taking occurs upon the issuance of a NITU, regardless of whether the NITU results in trail use of the corridor or if a trail agreement is reached. *Id.* at 578. Although this court determined that the *Arkansas Game & Fish* factors would be inapplicable to a categorical physical taking, Judge Lettow nevertheless applied them, concluding that "a taking occurred when the STB issued a NITU that blocked Mrs. Caquelin's reversionary interest in the land." *Id.* at 584.

Here, it is undisputed that the STB issued a NITU on July 14, 2014, that the parcels owned by plaintiffs adjoin the railroad corridor, and that no trail use agreement has been reached between the STB and CSXT. As the NITU has prevented abandonment of the corridor and precluded the plaintiffs from their reversionary interests in the land underlying the right-of-way, we find that the STB's issuance of a NITU effected a categorical physical taking and that the government owes plaintiffs just compensation. Nor, in any event, would the application of the *Arkansas Game & Fish* factors would lead to a different result. *Cf. Banks v. United States*, 138 Fed. Cl. 141 (2018) (denying the government's request to await a trial decision in *Caquelin* and granting summary judgment on liability for the plaintiffs for a temporary taking).

## CONCLUSION

Because the railroad obtained only a railroad right-of-way and that easement did not encompass railbanking, we grant plaintiffs' motion for partial summary judgment on liability and deny defendant's cross-motion. The parties are directed to confer and propose further proceedings in a joint status report, on or before March 20, 2020.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge